FILED
2014 Feb-21  AM 08:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MAGGIE LAMAR,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:12-cv-04002-AKK** |
| | ) | |
| **WELLS FARGO BANK & CO.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

This dispute centers around Maggie Lamar's service in the Army Reserves, her deployment to Iraq, and her subsequent discharge from Wells Fargo Bank & Co. (Wells Fargo). Unfortunately, Lamar's mental state prevented her from being able to return to Wells Fargo after her return from Iraq. Approximately fourteen months later, Wells Fargo discharged Lamar, and it is this discharge that she challenges in the present lawsuit. Specifically, Lamar, who is *pro se,* contends that Wells Fargo failed to afford her time to recover from serious mental and medical problems, discharged her without undertaking reasonable efforts to accommodate her disability, denied her employment opportunities including reinstatement, training, and promotion, and failed to reemploy or rehire her. As a result, Lamar

1

alleges claims for discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794, and for violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301, *et seq*. Doc. 25 at 1–3 (Lamar's Second Amended Complaint).

Wells Fargo's motion for summary judgment, doc. 40, is before the court and is fully briefed and ripe for review, docs. 41, 42, 45, 46. Based on a review of the evidence and the law, unfortunately for Lamar, Wells Fargo's motion is due to be granted. More specifically, summary judgment is due on the ADA claim because Lamar is estopped by her application for Social Security benefits, which is premised on her claims that she is unable to work, and/or because Lamar fails to establish that she could perform the essential duties of her former position at Wells Fargo or that Wells Fargo discriminated against her because of her disability. Lamar's Rehabilitation Act claim fails for the same substantive reasons as her ADA claim and because Lamar never rebutted Wells Fargo's contention that it was not a recipient of federal funds during the relevant period. Finally, with regards to Lamar's USERRA claims, Lamar never established that her status as a member of the military motivated Wells Fargo's decision to discharge her, a prerequisite for recovery under USERRA. Likewise, summary judgment is due on the failure-to-reinstate/rehire claim because Lamar failed to notify Wells Fargo of

her desire to return to work or to reapply for a position with the company within the two-year time frame dictated by USERRA. Therefore, in light of Lamar's failure to meet her burden on her claims, Wells Fargo's motion is due to be granted.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising

from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II. FACTUAL ALLEGATIONS

The following facts reflect an evaluation of the record in the light most favorable to Lamar. Lamar began working for Wells Fargo's predecessor, Wachovia Corp., in May 2008[1] in Birmingham, Alabama. Doc. 41 at 4. As a fraud

---

[1] Wells Fargo and Wachovia merged effective December 31, 2008. Doc. 41 at 4.

analyst, Lamar's essential job duties included interacting with customers regarding allegedly fraudulent transactions and identity theft, processing transactions, and selling various products. Doc. 41 at 5. Her job duties required her to be alert, to concentrate, and to recall, utilize and adhere to company policies, as well as regular and predictable attendance. *Id.*

On February 13, 2009, Lamar, who was then a member of the Army Reserves[2], began a tour of active military duty in Iraq. Doc. 42-4 at 2; doc. 42-7, ex. 13 at 161. As a result, Wells Fargo placed Lamar on paid military leave. Doc. 42-4 at 2. Lamar's tour of active duty ended on June 2, 2010.

Lamar suffers from post-traumatic stress disorder, depression, anxiety, and the lingering effects of a neck injury, and reports being unable to focus, remember, and work with others. Doc. 41 at 10. Because of her condition, she was unable to return to work at Wells Fargo at the conclusion of her military service.[3] Doc. 42-6 at 31. Initially, Lamar informed the Wells Fargo human resource department that she intended to use a portion of her ninety-day USERRA convalescent leave, and that her prospective return-to-work date was August 31, 2010. Doc. 42-4 at 3.

---

[2] Lamar joined the Army Reserves in 1990. Doc. 42-7, ex. 13 at 160. At the time of her deposition on October 14, 2013, the military was in the process of discharging Lamar because of her medical condition. Doc. 42-6 at 12.

[3] Although Lamar's anxiety and depression predate her 2009–10 tour of active duty, the news of her redeployment caused a recurrence of her symptoms, which were further exacerbated by the stress of working in a combat zone and being away from her children. Doc. 42-7, ex. 13 at 163–64.

5

However, when her convalescent leave expired, she remained unable to return to work, and Wells Fargo transitioned her from a "military case" to a "medical case" under its policies and in its leave software. Doc. 41 at 8.

On November 24, 2010, Steve Sarnacchiaro, a member of Wells Fargo's leave management department, called Lamar and told her that if she did not return to work Wells Fargo would discharge her. Doc. 41 at 8. Lamar described Sarnacchiaro's tone as "unprofessional," "mean-spirited," and "angry," but admitted that Sarnacchiaro did not mention Lamar's mental condition, physical condition, or military service. Doc. 42-6 at 18–19. Lamar testified that in subsequent conversations, Sarnacchiaro was "very professional." *Id*. at 27.

In spite of Sarnacchiaro's threat, Wells Fargo did not discharge Lamar, and instead placed her on medical leave. On January 12, 2011, it retroactively placed her on unpaid medical leave, effective August 12, 2010, through February 1, 2011. Doc. 42-7, ex. 22. Then, on April 20, 2011, it again retroactively approved her request for medical leave, effective February 1, 2011, through November 14, 2011. Doc. 42-7, ex. 23.Wells Fargo classified this second period of medical leave as "certified medical leave," (CML), which is unpaid leave in addition to an employee's Family and Medical Leave Act (FMLA) entitlement. Doc. 42-4 at 5. Employees on CML are nonetheless subject to Wells Fargo's extended absence policy (EAP) which provides employees with a maximum leave of absence, for

6

any reason, of twenty-four months. *Id.*

On June 8, 2011, as part of her normal duties, Tamra Bellamy, a Wells Fargo human resource specialist, used the company's leave software to generate a report listing all employees who were out on leave. Doc. 41 at 11. The report identified May 30, 2009[4] as Lamar's leave start date, and incorrectly indicated that all of Lamar's leave, including the period from May 30, 2009 to June 2, 2010, when Lamar was on active military duty, was CML. *Id.* Accordingly, Bellamy sent Lamar a letter stating that Wells Fargo's EAP provides its employees with a maximum leave of absence of twenty-four months, and that her employment would end on August 31, 2011 if she could not return to work by that date. *Id*. On August 31, 2011, having not heard from Lamar, Bellamy terminated Lamar's employment. Doc. 42-3 at 4.

The report that triggered Lamar's termination contained no indication of Lamar's military leave, and Bellamy testified that she had no reason to suspect or believe that Lamar had ever taken military leave.[5] Doc. 41 at 11. Bellamy testified that Lamar's military leave should not have contributed to the twenty-four-month EAP calculation, and had Bellamy known Lamar was on military leave between

---

[4] It is unclear from the record why the software indicated Lamar's leave began in May 2009, instead of February 2009, when Lamar's tour of active duty began.

[5] Both Bellamy and Sarnacchiaro handle human resource issues for Wells Fargo employees throughout the United States and work in an office located in Phoenix, Arizona. Doc. 42-3 at 2; doc. 42-4 at 2.

May 30, 2009 and June 2, 2010, Wells Fargo would not have terminated Lamar's employment on August 31, 2011. Doc. 42-3 at 3–4.

On February 13, 2012, Lamar filed an EEOC charge alleging in part that Wells Fargo discriminated against her by refusing to accommodate her disability. Doc. 42-7, ex. 2 at 2. In its position statement, Wells Fargo indicated that as of the statement's filing, it had received no information from Lamar regarding when she expected to be able to return to work. Doc. 42-7, ex. 26 at 63. Lamar testified that she did not attempt to inform Wells Fargo that she was able to return until after she discussed Wells Fargo's position statement with an EEOC representative sometime after the agency received the position statement on July 2, 2012. Doc. 42-6 at 55. The EEOC issued a right-to-sue letter to Lamar on August 30, 2012. Doc. 42-7 at 15.

## III. ANALYSIS

Wells Fargo contends it is due summary judgment on all of Lamar's claims.[6] The court will address the ADA claim in Section A, the Rehabilitation Act claim

---

[6] "'Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.'" *Osahar v. Postmaster Gen. of U.S. Postal Serv.*, 263 F. App'x. 753, 761 (11th Cir. 2008) (quoting *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998)). "However, in the context of summary judgment, even though pro se pleadings are entitled to a more lenient interpretation, 'the plaintiff must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case.'" *Id.* (quoting *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997)). "Furthermore, a pro se litigant 'is subject to the relevant law and rules of court including the Federal Rules of Civil Procedure.'" *Blakely v. Johnston*, Civil Action No. 10-0026-CG-N, 2010 WL 4269186, at *2 (S.D. Ala. Sept. 21, 2010) (quoting *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989)).

in Section B, and, finally, the USERRA claim in Section C.

## A. Lamar's ADA claim

### 1. Lamar's ADA claim is time-barred.

Wells Fargo argues that Lamar's ADA claim is time-barred because Lamar failed to file her complaint within ninety days of receiving her right-to-sue letter. Doc. 41 at 17. However, Wells Fargo bases its contention on Lamar's original complaint, which states that Lamar received her right-to-sue letter on August 30, 2012, *see* doc. 42-7, ex. 9 at 10, and Lamar's deposition testimony that the information in her original complaint was accurate, *see* doc. 42-6 at 38, 39. Wells Fargo ignores—as Lamar points out—that the right-to-sue letter unequivocally states that the EEOC mailed it on August 30, 2012. Doc. 42-7, ex. 2. at 1. Viewing the evidence in the light most favorable to Lamar, the court finds that the EEOC *mailed* the right-to-sue letter on August 30, 2012, and that Lamar received it thereafter. Nonetheless, when, as here, "the date of receipt is in dispute, this c[ircuit] has applied a presumption of three days for receipt by mail, akin to the time period established in Fed. R. Civ. P. 6(e)." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 953 n. 9 (11th Cir. 2005) (citing *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1342 (11th Cir. 1999)). Accordingly, absent any evidence to the contrary, the court presumes that Lamar received her right-to-sue letter on September 2, 2012, three days after the mailing date. Consequently, the deadline

for Lamar to file suit based on her EEOC charge was December 1, 2012.[7] Because

Lamar did not file her complaint until December 3, 2012, *see* doc. 1, her ADA

claim is time-barred.

### 2. Lamar is not a qualified individual.

Even if the court applied equitable tolling[8], Lamar's ADA claim still fails

because she is not a qualified individual with a disability.[9] As Wells Fargo

_____

[7] "It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964." *Zillyette*, 179 F.3d at 1339 (citing 42 U.S.C. § 12117(a)). In a nutshell, "[u]nder Title VII, in cases where the EEOC does not file suit or obtain a conciliation agreement, the EEOC shall so notify the person aggrieved and within 90 days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved. . . ." *Id*. (quoting 42 U.S.C. § 2000e-5(f)(1)) (internal quotation marks omitted).

[8] Although equitable tolling of deadlines is available to plaintiffs in ADA cases, *see Zillyette*, 179 F.3d at 1342, "[b]ecause equitable tolling is an extraordinary remedy to be applied sparingly, it is appropriate only when a plaintiff untimely files due to extraordinary circumstances that are both beyond her control and unavoidable even with diligence." *Hunt v. Ga. Dep't of Cmty. Affairs*, 490 F. App'x 196, 198 (11th Cir. 2012) (citing *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir.2006)). "Equitable tolling typically requires some affirmative misconduct, such as fraud, misinformation or deliberate concealment." *Id*. (citing *Jackson v. Astrue*, 506 F.3d 1349, 1355–56 (11th Cir. 2007)). The record in the present matter does not contain allegations of any such affirmative misconduct. Moreover, "ignorance of the law does not, on its own, satisfy the constricted 'extraordinary circumstances' test." *Id*. (quoting *Jackson*, 506 F.3d at 1356). Accordingly, this circuit has "previously rejected the contention that pro se status, ignorance of the judicial process or slow administrative proceedings warrant application of equitable tolling." *Id*. (citing *Wakefield v. R.R. Ret. Bd.*, 131 F.3d 967, 969–70 (11th Cir.1997)).

[9] "'[I]n this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.'" *Dulaney v. Miami-Dade Cnty.*, 481 F. App'x 486, 489 (11th Cir. 2012) (quoting *Holly v. Clairson Indus.*, LLC, 492 F.3d 1247, 1255 (11th Cir. 2007)). "Under this burden-shifting analysis, the plaintiff must first establish a prima facie case of discrimination under the ADA by showing (1) he is disabled, (2) he is a qualified individual, and (3) he was subjected to unlawful discrimination because of his disability." *Id*. (citing *Holly*, 492 F.3d at 1255–56).

correctly points out, Lamar could not perform the essential functions of a fraud analyst and her Social Security benefits application estops her from claiming to be a qualified individual.

### a. Lamar is estopped from claiming she is a qualified individual.

First, as to Wells Fargo's estoppel argument, in *Cleveland v. Policy Mgmt. Sys. Corp.*, the Supreme Court held that:

> [I]n some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim. . . . An ADA plaintiff bears the burden of proving that she is a qualified individual with a disability—that is, a person who, with or without reasonable accommodation, can perform the essential functions of her job. . . . [A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, unable to work will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, . . . an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.

526 U.S. 795, 806 (1999) (citations omitted) (internal quotation marks omitted). The court went on to explain that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Id*.

The record indicates that Lamar filed an application for Social Security

benefits on February 23, 2013. In it, she states that "since my return from Iraq, I am no longer able to be gainfully employed due to long term episodes of depression that holds me in home or in my bed barely able to function doing even the smallest tasks. I have suffered these 3 wk to a month long episodes off and on for almost 3 years and have not been able to sustain my attempts to get my work life back on track since then." Doc. 42-7 ex. 17. The application lists April 4, 2010 as Lamar's disability onset date. *Id.* These admissions undermine Lamar's contentions in this case. In fact, Lamar offers no explanation for the contradiction between her Social Security benefits application, which indicates that in August 2011 she had been unable to work for over a year, and her ADA claim, which is premised on her allegedly being able to perform the duties of a fraud analyst when Wells Fargo terminated her position in August 2011. Lamar also was unable to provide an explanation for the contradiction when counsel for Wells Fargo asked her about it during her deposition. Doc. 42-6 at 48. Because Lamar fails to provide any explanation of the contradiction between her Social Security benefits application and her ADA claim, she is estopped from claiming that she is a qualified individual.

### b. Lamar fails to show that she could perform the essential functions of a fraud analyst.

Alternatively, even if Lamar is not estopped, her ADA claim would still fail.

In order to survive Wells Fargo's motion for summary judgment, Lamar must put forth sufficient evidence to establish that she was a "qualified individual." *Dulaney*, 481 F. App'x at 489 (citing *Holly*, 492 F.3d at 1255–56). A "'qualified individual' is one who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The plaintiff bears the burden of identifying an accommodation and demonstrating that the accommodation allows him to perform the job's essential tasks." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255–56 (11th Cir. 2011) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997)).

According to Wells Fargo, Lamar is not a qualified individual with a disability because her proposed accommodations are unreasonable and she could not perform the essential functions of a fraud analyst, namely that she was unable to be alert or concentrate and attend work on a regular and predictable basis.[10] Doc. 41 at 21. Lamar counters by asserting that Wells Fargo cannot "determine whether [she] was a qualified [individual]" because "the only people who were qualified to determine whether [she] would have been ready and able to return to

---

[10] The undisputed essential job duties of a fraud analyst include interacting with customers regarding allegedly fraudulent transactions and identity theft, processing transactions, and selling various products, which require alertness, ability to concentrate and to recall, utilize and adhere to company policies, and regular and predictable attendance. Doc. 41 at 5.

[her] job with [Wells Fargo] would have been [her] personal doctors," and her "doctors were never given the chance to evaluate [her] at the proper time." Doc. 45 at 1. Unfortunately for Lamar, the burden is on her, not Wells Fargo, to submit sufficient evidence to enable a jury to find that she was capable of working at the relevant time, which in this case was in August 2011, when Wells Fargo discharged her. *See Dulaney*, 481 F. App'x at 489 (stating that "*the plaintiff* must . . . establish a prima facie case of discrimination under the ADA") (emphasis added) (citing *Holly*, 492 F.3d at 1255–56). Lamar offers absolutely no evidence that she could perform the duties of a fraud analyst in August 2011. Moreover, contrary to Lamar's claim that her physicians did not examine her at "the proper time,"[11] Lamar's medical records in fact indicate that medical professionals examined her in the months preceding her discharge and did not believe she could return to work. *See* doc. 32-7, ex. 5 at 5 (FMLA Certification of Health Care Provider Team Member report prepared by Lamar's mental health counselor on December 21, 2010, stating that Lamar became unable to work on August 12, 2010, and that her expected return-to-work date was "undetermined"); doc. 32-7, ex. 14 at 98–99, 100 (June 17, 2011 report prepared by a clinical psychologist

---

[11] Lamar notes that "[a]fter [Wells Fargo] 'accidentally' terminated me, all information from that point on was compromised by the severe exacerbation of my existing symptoms." Doc. 45 at 1. The medical records referred to by the court were generated before Lamar learned of her termination. *See* doc. 42-6 at 60 (Lamar's deposition testimony in which she stated she did not open or read Bellamy's June 8, 2011 letter notifying Lamar that she would be terminated on August 31, 2011 until after August 31, 2011).

stating that "based on the cognitive testing, Ms. Lamar does have the requisite skills to maintain gainful employment. However, given her psychiatric distress at this time, employment would likely be difficult" and noting that "[Lamar] does not believe that she would be able to maintain any employment at this time"). As is evident, the medical record belies Lamar's contention and, in fact, casts doubt on her ability to work at all during the months preceding the termination.

Additionally, Lamar is also not a qualified individual because none of the several accommodations she identified is reasonable. First, in her court filings, Lamar asks for additional time for recovery. *See id.* at 3 (alleging that Wells Fargo "violated EEOC law by terminating Lamar instead of giving a reasonable accommodation, of need of more recovery"). Unfortunately for Lamar, granting indefinite leave is not a reasonable accommodation because "it does not allow [her] to perform . . . her job duties in the present or immediate future." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003).

Next, during her deposition, Lamar stated that her mental state impedes her ability to work, but that she might be able to work if an employer allowed her to leave when she felt unwell, or if a coworker could cover for her. *See* doc. 42-6 at 46 (stating that "I am not able to get a job because of these things. Because there's no way for me to have a job and be off when I need to be. Have the ability to say, you know, I can't do anymore today, I can come back tomorrow. To say I can't

15

make it in this week, I'm exhausted"); *id.* at 47 (agreeing with opposing counsel that she is "unable to work a 40 hour work week unless [she has] some situation where the employer would allow [her] to basically come and go as [she] pleases"); *id.* at 58 (stating that working a 40-hour-a-week job requiring attendance "would be a very hard struggle" but that she could do so "if they had somebody working with me. Let's say they had a team, it was myself and someone else and we could cover for each other"). Like Lamar's request for additional time to recover, neither of these options is a reasonable accommodation because "while . . . the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260 (citing *Earl v. Mervyns*, 207 F.3d 1361, 1367 (11th Cir. 2000)). As Lamar concedes since she does not contest Wells Fargo's contention, "show[ing] up to work on a regular and predictable basis," doc. 41 at 5, is an essential function of the fraud analyst position. Consequently, eliminating that function is not a reasonable accommodation. Moreover, "[a]n accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables *the employee* to perform the essential functions of the job." *Lucas*, 257 F.3d at 1255 (emphasis added) (citing *LaChance v. Duffy's Draft House, Inc*., 146 F.3d 832, 835 (11th Cir.1998)). Arranging for a coworker to perform Lamar's duties in her

16

absence—as Lamar requests—would merely compensate for Lamar's inability to do so, rather than enabling Lamar to perform her job. *See* 29 C.F.R. Part 1630 app. § 1630.2(o) (EEOC Interpretive Guidance to the ADA, stating that "suppose a security guard position requires the individual who holds the job to inspect identification cards. An employer would not have to provide an individual who is legally blind with an assistant to look at the identification cards for the legally blind employee. In this situation the assistant would be performing the job for the individual with a disability rather than assisting the individual to perform the job") (citing *Coleman v. Darden*, 595 F.2d 533 (10th Cir. 1979)). Finally, while these purported accommodations address Lamar's attendance problems, they have no bearing on her ability to "be alert, able to concentrate, and recall, utilize, and adhere to Wells Fargo's policies," doc. 41 at 5, in light of Lamar's self-described "inability to focus, . . . remember, . . . and work with people," doc. 42-6 at 40. In sum, Lamar fails to identify a reasonable accommodation that would allow her to perform the essential functions of the fraud analyst position.

Lamar both fails to prove that she is a qualified individual and is estopped from asserting such a claim by her application for Social Security benefits, in which she claims she has been unable to work since April 4, 2010. Consequently, she fails to present a prima facie case of discrimination under the ADA.

### 3. Lamar fails to show that she was subjected to unlawful discrimination.

Lamar's ADA claim also falls short because she cannot show that Wells Fargo subjected her to unlawful discrimination because of her disability. *See Dulaney*, 481 F. App'x at 489 (citing *Holly*, 492 F.3d at 1255–56). As explained in Part III(A)(2)(b), none of the accommodations identified by Lamar is reasonable, and, by her own admission, she never asked for any accommodations. *See* doc. 42-7, ex. 27 (Lamar's EEOC intake questionnaire, indicating that Lamar never asked for an accommodation because she "did not know [she] had that option"); doc. 42-6 at 59 (Lamar's deposition testimony, indicating the same). Consequently, Lamar failed to meet her burden of establishing that Wells Fargo discriminated against her because of her disability.[12] *See Lucas*, 257 F.3d at 1255 (stating that in a failure-to-accommodate claim, such as this, "an employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer") (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).

To the extent that Lamar's complaint raises a claim premised on her termination rather than Wells Fargo's failure to accommodate her disability, that claim fails as well because, as explained in Part III(A)(2), Lamar is not a qualified

---

[12] As the court previously explained, "[t]he plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id*. at 1255–56 (citing *Willis*, 108 F.3d at 283. "Both [Eleventh Circuit] precedent and the EEOC's interpretive guidelines clearly provide that the initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her." *Gaston v. Bellingrath Gardens and Home, Inc*., 167 F.3d 1361, 1364 (11th Cir. 1999).

individual and is estopped from making such a claim. Moreover, even if Lamar was able to make a prima facie showing of discrimination, her ADA claim would still fail because she has not shown that Wells Fargo's given reason for terminating her employment was pretext for discrimination.[13] *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008) (explaining that if an employer rebuts a prima facie case by producing evidence that it had a legitimate, non-discriminatory reason for the challenged action, the burden shifts back to the plaintiff to "show that the proffered reason really is a pretext for unlawful discrimination") (citations omitted) (internal quotation marks omitted).

Here, Wells Fargo has presented a legitimate, nondiscriminatory reason for terminating Lamar's employment: Bellamy's mistake. The burden then shifts to Lamar to show that Wells Fargo's reason is pretextual. To do so, Lamar must "provide sufficient evidence to allow a reasonable fact finder to conclude that [Wells Fargo's] proffered reasons were not actually the motivation for her

---

[13] Wells Fargo contends that Lamar's claim fails because she has not identified "a similarly situated comparator that was treated more favorably or demonstrate[d] that she was replaced by someone outside of her protected class that was treated more favorably." Doc. 41 at 24. Identifying a comparator is not a required element of a reasonable accommodations claim:

> In race and sex employment discrimination cases, discrimination is usually proved by showing that employers treat similarly situated employees differently because of their race or sex. However, the very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances—namely, when different treatment would allow a disabled individual to perform the essential functions of his position by accommodating his disability without posing an undue hardship on the employer. Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement.

*Holly*, 492 F.3d at 1263.

[termination]." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). Lamar presents no evidence that Wells Fargo's articulated reason is pretext for discrimination, nor can she make such a showing because she does not allege, and the record does not indicate, that anyone associated with Wells Fargo ever criticized Lamar because of her disability. Indeed, Lamar testified that during her single hostile interaction with an employee, the November 24, 2010 telephone call from Sarnacchiaro, Sarnacchiaro made no reference to her disability. Doc. 42-6 at 18. Moreover, Bellamy testified that in at least one other instance, after she erroneously notified a Wells Fargo employee that Wells Fargo was set to terminate the employee's employment because of the same reason, i.e. her system failed to flag that part of that employee's more than twenty-four-month leave included military leave, Bellamy rescinded the decision when the employee informed Bellamy of the military leave. Doc 42-3 at 4. The fact that the same error occurred with regard to another employee and that Bellamy corrected it undermines the contention that Wells Fargo targeted Lamar because of her disability.

Ultimately, while the court agrees with Lamar that her discharge was unfair, "'an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Dulaney*, 481 F. App'x at 490 (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984)). Where, as here, Lamar presents no evidence indicating Wells Fargo's given reason for terminating her employment was pretextual, nor does the record lend any support to such a contention, summary judgment is warranted, even if Lamar had filed her claim in a

timely manner or established that she is a qualified individual with a disability. Therefore, Lamar's ADA claim is due to be dismissed.

## B. Lamar's Rehabilitation Act claim

Because "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases," *see e.g., Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)), summary judgment is also due on the Rehabilitation Act claim because, as explained in part III(A), Lamar fails to present a prima facie case of discrimination. More basically, though, Lamar abandoned her Rehabilitation Act claim because she failed to address Wells Fargo's arguments concerning it in her response to its motion for summary judgment. *See e.g.*, *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n. 2 (11th Cir. 2009) (citing *Transamerica Leasing, Inc. v. Inst. Of London Underwriters*, 267 F.3d 1303, 1308 n. 1 (11th Cir. 2001)). Additionally, Lamar presents no evidence refuting Wells Fargo's contention that it received no federal funding during the period when Lamar claims it discriminated against her, and consequently it is not subject to liability under the Rehabilitation Act. *See* doc. 41 at 16–17. For these reasons, Lamar's Rehabilitation Act claim is due to be dismissed.

## C. Lamar's USERRA claims

Although Lamar's second amended complaint lists four separate alleged USERRA violations, *see* doc. 25 at 1–2, they essentially boil down to two: a claim alleging that Wells Fargo discharged Lamar because of her military service, *see id*. at 1, and a claim that Wells Fargo failed to reinstate or rehire her, *id*. at 2. The

court will consider each of these in turn.

### 1. Lamar fails to establish that her military service motivated her termination.

Lamar contends that Wells Fargo violated USERRA by terminating her employment because of her military service. "USERRA provides that a member of the Armed Services 'shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership.'" *Dees v. Hyundai Motor Mfg. Ala., LLC*, 368 F. App'x 49, 50 (11th Cir. 2010) (quoting 38 U.S.C. § 4311(a)). "Congress enacted USERRA 'to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service' and 'to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers.'" *Id.* (quoting 38 U.S.C. § 4301(a)(1), (a)(2)). "An employer violates these provisions if the employee's membership in the armed services 'is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership.'" *Id.* at 51 (quoting 38 U.S.C. § 4311(c)(1)).

"To establish a prima facie case under USERRA, a plaintiff must 'show by a preponderance of the evidence that his protected status was a motivating factor,' but that status need not be the sole cause as long as 'it is one of the factors that a truthful employer would list if asked for the reasons for its decision.'" *Id.* (quoting *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005)).

"Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Id*. (quoting *Coffman*, 411 F.3d at 1238). Because "discrimination is seldom open or notorious . . . court[s] can infer discriminatory motivation under the USERRA from a variety" of circumstantial evidence, including:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Id.* (quoting *Coffman*, 411 F.3d at 1238).

Basically, Lamar contends that her military service was a motivating factor in Wells Fargo's decision to terminate her employment because Wells Fargo included the time she spent on military leave in calculating her twenty-four-month absence. Doc. 45 at 2. However, this argument ignores that USERRA liability hinges on an employer acting based on "discriminatory motivation." *Dees*, 368 F. App'x at 51 (quoting *Coffman*, 411 F.3d at 1238). In that respect, although Lamar's military leave was the basis of the erroneous calculation that led Wells Fargo to terminate Lamar's employment, it did not motivate her termination. Put differently, Bellamy did not initiate Lamar's termination because she believed Lamar exceeded the maximum set forth in Wells Fargo's EAP, in part, because of military leave; rather, Bellamy initiated Lamar's termination because Wells Fargo's leave software indicated Lamar had been on CML for more than 24 months. Doc. 42-3 at 3. Until Lamar initiated this lawsuit, Bellamy did not know

that Lamar had ever been on military leave. *Id*. Significantly, Lamar does not dispute this testimony. In short, the inclusion of the military leave in the calculation does not establish that military service motivated the discharge.

Additionally, unlike the circumstances described by the *Coffman* and *Dees* courts as evidence of discriminatory motivation, here, multiple factors refute Lamar's contention that her military service motivated her discharge. Specifically, over a year passed between the conclusion of Lamar's military service and the termination of her position, the record contains no indication of inconsistencies between Wells Fargo's given reason for terminating Lamar's position—Bellamy's error—and other actions by Wells Fargo, and, in fact, when Bellamy also miscalculated the leave time of another service member and sent that service member an EAP notice, the service member notified her of the error, and she corrected it before the service member could be terminated. Doc. 42-3 at 4. Moreover, there is no indication that Wells Fargo expresses hostility toward service members. To the contrary, Lamar testified that no one at Wachovia or Wells Fargo ever made derogatory remarks about her service. *See* doc. 42-6 at 32; *see also id*. at 18 (Lamar's testimony that she did not recall Sarnacchiaro mentioning her military service during the November 24, 2010 telephone call), 23 (Lamar's testimony that no one at Wells Fargo made derogatory remarks about her military service when she contacted Wells Fargo in 2012 about returning to work). Furthermore, although it was not obligated to do so, *see* 38 U.S.C. § 4316(b)(1)(B), Wells Fargo paid Lamar her full salary while she was on military leave, doc. 41 at 30. Finally, the record contains no evidence that Wells Fargo

24

treated its employees who served in the armed forced differently than their civilian counterparts.

Based on this record, summary judgment is due on the USERRA wrongful termination claim because Lamar fails to present any evidence that her military service motivated Wells Fargo's decision to terminate her employment.

## 2. Lamar failed to notify Wells Fargo she could return to work or reapply for a position with the company within two years after completing her military service.

Lamar contends also that Wells Fargo violated USERRA by failing to reinstate her to her former position or rehire her. USERRA provides that "[a] person who is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of service in the uniformed services shall, at the end of the period that is necessary for the person to recover from such illness or injury, report to the person's employer . . . or submit an application for reemployment with such employer . . . . [S]uch period of recovery may not exceed two years." 38 U.S.C. § 4312(e)(2)(A); *see also* 20 C.F.R. § 1002.116. By her own admission, although Lamar's military service ended in early June 2010, Lamar only notified Wells Fargo that she was able to return to work or reapply for a position with the company well after the two-year deadline, specifically sometime after July 2, 2012. *See* doc. 42-6 at 60 (Lamar's deposition testimony stating that she did not notify Wells Fargo or reapply until after the EEOC received Wells Fargo's position statement on July 2, 2012). Consequently, Lamar's USERRA failure-to-reinstate/rehire claim fails because of Lamar's failure to take appropriate

action during the relevant time period.

## IV. CONCLUSION

For the reasons stated fully above, Lamar has failed to present sufficient evidence to support her claims. Therefore, the court finds that Wells Fargo's motion is due to be granted. The court will enter a separate order in accordance with the memorandum opinion.

**DONE** this 21st day of February, 2014.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE